BRYAN SCHRODER
United States Attorney
JONAS M WALKER
STEVEN SKROCKI
Assistant U.S. Attorneys
Federal Building & U.S. Courthouse
222 W. 7th Avenue, #9, Room 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-6011
E-mail: jonas.walker@usdoj.gov

DEBORAH L. CONNOR
Chief, Money Laundering and Asset Recovery Section (MLARS)
WOO S. LEE
Deputy Chief, International Unit
MICHAEL OLMSTED
Senior Trial Attorney, International Unit
Criminal Division
United States Department of Justice
1400 New York Avenue, N.W., 10th Floor
Washington, D.C. 20530
Telephone: (202) 514-1263
Email: Woo.Lee@usdoj.gov

Attorneys for Plaintiff:
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff<br><br>v.<br><br>FUNDS IN THE AMOUNT OF<br>73,293,750 AED (APPROXIMATELY<br>$20 MILLION) IN THE POSSESSION<br>AND CONTROL OF RAS AL<br>KHAIMAH INVESTMENT AUTHORITY<br>(RAKIA) | Civil No. **3:20-cv-00126-JMK** |

and                                            )
                                               )
ALL CLAIMS FILED AND ASSERTED                  )
BY VI2 PARTNERS GMBH AGAINST                    )
RAS AL KHAIMAH INVESTMENT                       )
AUTHORITY GEORGIA LLC IN CASE                   )
NO. 2b/4319-17 PENDING BEFORE                   )
THE TBILISI COURT OF APPEALS,                   )
REPUBLIC OF GEORGIA AND                         )
PROCEEDS THEREOF,                               )
                                               )
         Defendant *in rem*.                    )

## COMPLAINT FOR FORFEITURE IN REM

The United States of America, by its undersigned attorneys, brings this Complaint for Forfeiture *in Rem* and alleges as follows in accordance with Rule G(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules").

### NATURE OF THE ACTION

1.      The plaintiff is the United States of America.

2.      The defendants in this action (the "Defendant *Res*") are funds in the amount of approximately 73,293,750 AED (the "Defendant Funds") in the custody of the Ras Al Khaimah Investment Authority ("RAKIA") in the United Arab Emirates ("UAE") as well as a legal claim (the "Defendant Claim") for the Defendant Funds filed and asserted by VI2 Partners GmbH ("VI2") in *VI2 Partners GmbH v. Ras Al Khaimah Investment Authority Georgia LLC* (Case No. 2b/4319-17), which is currently pending before the Tbilisi Court of Appeals in the Republic of Georgia (the "Georgia Action"). The Defendant Funds were deposited by VI2's predecessors in interest while seeking to purchase a hotel in Tbilisi, Georgia, from its owner, the Ras Al Khaimah

2

Investment Authority Georgia LLC. The Georgia Action was filed by VI2 on or about February 19, 2016, seeking a return of the Defendant Funds and damages when the purchase of the hotel did not occur.

3. The only persons believed by the government to have an interest that may be affected by this action are VI2 and Ras Al Khaimah Investment Authority Georgia LLC, which is a wholly-owned subsidiary of RAKIA.

## NATURE OF THE ACTION

4. This is a civil action *in rem* to forfeit assets involved in and traceable to an international conspiracy to launder funds traceable to violations of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1705, and a scheme to defraud financial institutions in the Republic of Korea ("Korea"). The United States of America seeks the forfeiture of the Defendant *Res* pursuant to 18 U.S.C. § 981(a)(1)(C), on the ground that it was derived from violations of U.S. and Korean law, and pursuant to 18 U.S.C. § 981(a)(1)(A) on the ground that the Defendant *Res* constitutes property involved in one or more money laundering offenses in violation of 18 U.S.C. §§ 1956 and/or 1957, and is property traceable to such property

## JURISDICTION AND VENUE

5. This is a civil forfeiture action brought pursuant to 18 U.S.C. § § 981(A) and (C).

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

7. Venue is proper in this district pursuant to 28 U.S.C. § § 1355(b)(1)(A) and 1355(b)(2) because acts and omissions giving rise to the forfeiture took place in the District of Alaska.

3

## BACKGROUND:  RELEVANT INDIVIDUALS AND ENTITIES

8.     **Kenneth Zong** is a U.S. citizen who formed multiple companies registered in Korea, including KSI Ejder Korea Inc. and Anchore.  On December 15, 2016, Kenneth Zong was indicted in the District of Alaska for conspiracy to violate IEEPA, money laundering and money laundering conspiracy.  The indictment alleges, among other things, that Zong and others allegedly conspired to evade the prohibitions of IEEPA and the Iranian Transactions and Sanctions Regulations ("ITSR") by engaging in false, fictitious and fraudulent transactions which were designed to unlawfully convert and remove Iranian owned funds, equivalent to approximately $1 billion U.S. dollars ("USD").  These funds were held in Korean bank accounts and converted into more easily tradeable currencies, such as USDs and/or euros, by deceiving Korean banks and regulators into thinking the transactions were legitimate.  On or about February 6, 2013, Zong was also convicted in Korea of violations of Korea's Foreign Exchange Transaction Act and customs laws in connection with his operation of KSI, and sentenced to two years imprisonment.  Zong remains in Korea.

9.     **Pourya Nayebi** is an Iranian national and born on July 25, 1974.  In 2011, Nayebi, along with **Houshang Hosseinpour** and **Houshang Farsoudeh** (collectively the "Uncharged Conspirators"), acquired the majority of shares in a licensed bank in the Republic of Georgia with direct correspondent ties to other international financial institutions through a Liechtenstein-based foundation.  The Uncharged Conspirators used the Georgia financial institution to facilitate transactions for multiple Iranian banks, including Bank Melli, Mir Business Bank, Bank Saderat, and Bank Tejarat.  On February 6, 2014, the U.S. Department of the Treasury designated the

4

Uncharged Conspirators as individuals subject to U.S. sanctions pursuant to Executive Orders 13224 and 13382. In announcing this designation, the Treasury Department stated that they and others subject to U.S. sanctions played a key role in evading U.S. sanctions on Iran.

10. **Houshang Hosseinpour** is an Iranian national and born on March 21, 1967.

11. **Houshang Farsoudeh** is an Iranian national and born on October 10, 1968. On February 6, 2014, Farsoudeh was designated by the U.S. Department of the Treasury as an individual subject to U.S. sanctions pursuant to Executive Orders 13224 and 13382.

12. **Anchore** is a legal entity registered in Seoul, Korea. It was originally formed by Kenneth Zong in 2009 as KSI Ejder Korea Inc. before Zong changed its name to Anchore in 2011.

13. **Orchidea Gulf Trading** ("**Orchidea Trading**") is an entity based in the United Arab Emirates and owned by the Uncharged Conspirators. On February 6, 2014, Orchidea Trading was designated by the U.S. Department of the Treasury as an entity subject to U.S. sanctions pursuant to Executive Orders 13224 and 13382.

14. **MSL & Co.** ("**MSL**") is another entity controlled by the Uncharged Conspirators. MSL was originally based in the UAE. At an unknown date, MSL changed its name to European Oil Traders SA and moved its location to Niederglatt, Switzerland. On February 6, 2014, European Oil Traders was designated by the U.S. Department of the Treasury as an entity subject to U.S. sanctions pursuant to Executive Orders 13224 and 13382.

15. **Industrial Bank of Korea** ("**IBK**") is a financial institution in the Republic of Korea where the Central Bank of Iran maintained an account that at one time possessed a balance of over $1 billion USD (the "CBI Won Account").

5

16.     **Ras al Khaimah Investment Authority** ("**RAKIA**").  RAKIA is an industrial licensing and promotion agency owned by Ras al Khaimah intended to promote investments in the Emirate of Ras al Khaimah, one of the seven emirates that make up the UAE.  RAKIA is currently in possession of the equivalent of approximately $20 million of funds paid to RAKIA by the Uncharged Conspirators in connection with a failed attempt to purchase a hotel owned by RAKIA in the Tbilisi, Georgia (the "Tbilisi Hotel").

17.     **VI2 Partners GmbH** ("**VI2**") is an Austrian legal entity owned by Marc-Milo Lube, an Austrian national.  VI2 alleges in the Georgia Action it filed against RAKIA that it owns and acquired from the Uncharged Conspirators any interest and/or claim the Uncharged Conspirators formerly possessed against RAKIA in connection with their failed attempt to purchase the Tbilisi Hotel.

## EVIDENCE SUPPORTING FORFEITURE

18.     The Defendant *Res* represents the proceeds of more than $1 billion in Korean Won ("KRW") converted into U.S. dollars in or through U.S. financial institutions in violation of IEEPA.  The funds were then further transferred and laundered by Zong, a U.S. citizen—at the direction of the Uncharged Conspirators—through a web of shell company accounts at financial institutions in several jurisdictions, including the UAE.

## FACTS

### I.     U.S. AND KOREAN SANCTIONS ON IRAN

19.     U.S. law prohibits any U.S. person, including financial institutions inside the United States, from providing services directly or indirectly to Iran or the Government of Iran, in

6

the absence of a license from the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"). This prohibition includes the unlicensed processing of transactions through U.S. banks that are for the benefit of the Government of Iran, including any agency or instrumentality of the Government of Iran or any entity owned or controlled by the Government of Iran. The Central Bank of Iran ("CBI") is part of the Government of Iran and has been identified by OFAC as an entity owned or controlled by the Government of Iran since prior to 2000.

20. The International Emergency Economic Powers Act (50 U.S.C. §§ 1701 et seq.) authorizes the President "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States" by declaring a national emergency with respect to such threats, 50 U.S.C. § 1701(a), and to take steps to address such threats, including the authority to "investigate, regulate, or prohibit . . . any transactions in foreign exchange," "transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof," and "the importing or exporting of currency or securities by any person, or with respect to any property, subject to the jurisdiction of the United States[,]" 50 U.S.C. § 1702(a)(1)(A).

21. Beginning with Executive Order No. 12170, issued on November 14, 1979, the President found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and ... declare[d] a national emergency to deal with that threat." On March 15 and May 6, 1995, the President issued

7

Executive Orders Nos. 12957 and 12959, prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person, and on August 19, 1997, issued Executive Order No. 13059 clarifying the previous orders (collectively, the "Executive Orders"). The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2012 the Iranian Transactions and Sanctions Regulations, or "ITSR") implementing the sanctions imposed by the Executive Orders.

22. The ITSR, Title 31, Code of Federal Regulations, Section 560.204, prohibit, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale or supply of goods, technology or services to a third country knowing that such goods, technology or services are intended for Iran or the Government of Iran, without a license from OFAC. The ITSR provide that the transfer of funds, directly or indirectly, from the United States or by a U.S. person to Iran or the Government of Iran is a prohibited export, reexport, sale, or supply of services to Iran or the Government of Iran. See 31 C.F.R. § 560.427(a). The ITSR further prohibit transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR. 31 C.F.R. § 560.203.

8

23.     OFAC also maintains the Foreign Sanctions Evaders List ("FSE List") to identify foreign persons sanctioned under Executive Order 13608, "Prohibiting Certain Transactions With and Suspending Entry Into the United States of Foreign Sanctions Evaders With Respect to Iran and Syria." This FSE List includes persons sanctioned pursuant to Executive Order 13608 for engaging in conduct relating to the evasion of United States economic and financial sanctions with respect to Iran or Syria.

24.     In 2010, Congress also enacted The Comprehensive Iran Sanctions Accountability and Divestment Act of 2010 ("CISADA"), which, among other things, authorized the imposition of sanctions against foreign financial institutions that engaged in transactions either facilitating Iran's nuclear or ballistic missiles programs, or with persons and entities designated under United Nations and U.S. sanctions against terrorism and weapons of mass destruction proliferation.

25.     In addition to U.S. sanctions, Korea also imposed its own bilateral sanctions on Iran beginning on or before 2011. The Korean government, in consultation with the United States Government, authorized IBK and another Korean bank to each establish a Korean won ("KRW")-denominated account belonging to the Central Bank of Iran.

26.     In 2011, the Central Bank of Iran maintained an account at IBK in Seoul containing the equivalent of over $1 billion in KRW (the "CBI Won Account"). The purpose of this account was to permit limited forms of trade between Korea-based entities and Iran, including the import of Iranian oil to Korea. The CBI Won Account at IBK was subject to several limitations. Among other things, the account could be used for transactions involving only certain, permissible types of goods, including crude oil exports from Iran. The CBI Won Account could also be used to

9

compensate Korean businesses who were owed compensation from Iran for certain types of limited and permissible commercial trade and sales actions. All other transactions – including transactions for weapons — were specifically prohibited. Additionally, transactions involving the CBI Won Account could not involve USD.

## II.     THE SCHEME TO FRAUDULENTLY CONVERT CBI ACCOUNT FUNDS

27.     Beginning on or before 2011 and continuing thereafter, Kenneth Zong and the Uncharged Conspirators, namely—Pourya Nayebi, Houshang Hosseinpour, and Houshang Farsoudeh – conspired to convert KRW held in the CBI Won Account into USD and other currencies, and to launder those funds in and through accounts held by multiple shell companies, including Orchidea Trading, in several jurisdictions, including the UAE.

28.     In furtherance of this scheme, Zong and his associates orchestrated a complex scheme to defraud Korean banks, including IBK. Zong and his associates fraudulently represented to IBK and other Korean banks that Anchore, a Korean company Zong controlled in Seoul, had sold hundreds of millions of dollars' worth of permitted commercial goods and services to Iran. In truth, no such transactions had ever taken place. Rather, these false representations were made to IBK in order to cause IBK to transfer funds from the CBI Won Account to Anchore's account at IBK, where Zong then—at the direction of the Uncharged Conspirators—wire transferred the proceeds of this deceptive and illegal scheme to multiple shell company accounts in several other jurisdictions, including the UAE.

29.     In total, between February 10, 2011 and July 20, 2011, Zong initiated over 88 transactions via IBK accounts, thereby causing $1,004,662,911.57 worth of Iranian funds to be

transferred by IBK's CBI Won Account to accounts Zong controlled, converted to USD, and transferred by IBK at Zong's direction to other accounts that Zong and his co-conspirators, the Uncharged Conspirators, controlled and/or for their benefit, all in violation of U.S. sanctions laws.

30.     As explained below, approximately $20 million of these funds were used by the Uncharged Conspirators in attempting to purchase the Tbilisi Hotel in the Republic of Georgia, and $10 million was transferred to bank accounts controlled by Zong and his relatives at financial institutions in Anchorage, Alaska.

**A. ZONG REPRESENTED FALSELY TO IBK THAT KSI/ANCHORE SOLD MARBLE TILES TO IRAN IN ORDER TO WITHDRAW OVER $2 MILLION IN FUNDS FROM THE CBI WON ACCOUNT**

31.     In or around July 2009, Kenneth Zong registered a company named KSI Ejder Korea Inc. ("KSI") in Seoul, Korea. On or about January 25, 2011, Zong opened a bank account at IBK in KSI's name. In or around February 2011, Zong changed KSI's name to Anchore.

32.     Beginning in at least January 2011, Zong and the Uncharged Conspirators manufactured a host of commercial documents fraudulently representing that Anchore acquired $2 million worth of marble tiles and other construction supplies from MSL and sold and exported these goods to Farsoodeh and Partnership ("Farsoodeh"), an Iranian company located on Kish Island in Iran.

33.     In truth, Anchore never sold or delivered any marble tiles or construction materials to Farsoodeh. Nor did Anchore acquire any marble or construction materials from MSL. In fact, Zong and the Uncharged Conspirators fabricated and backdated all of the above commercial documents to give the appearance that Anchore was engaged in legitimate commercial

11

transactions with Farsoodeh and MSL. Zong emailed an associate of the Uncharged Conspirators on or about February 1, 2011, explaining:

> Let's do this way.
> UAE company issues an OFFER SHEET to KSI EJDER KOREA INC then I will issue a
> Commercial INVOICE to Farsoodeh & Partnership Co. based on UAE Offer sheet.
> OFFER sheet must be back dated Jan 17, 2010 and description of commodity
> is various different kinds of Italian Marbel Tile, finished in UAE (which
> country ?) Offer sheet must be lower amount than INVOICE amount. Invoice
> amount shall be KRW2,650,000,000.- OFFER price should be USD2,303,347.80 (or
> similar). it shows KSI EJDER makes a little profit, Again this is just paper
> works for to get approval from Korea Central bank.
> Regards/ken"

34.    Between January 27 and 28, 2011, within three days of opening the Anchore account at IBK, Zong presented the above fraudulent commercial contracts and invoices to IBK in order to justify and receive authorization to accept two monetary transfers from the CBI Won Account—one for ₩2,000,000,000 KRW and a second for ₩650,000,000 KRW—to Anchore's account at IBK. The transfers were executed by IBK after Zong presented the fraudulent invoices and contracts to IBK and Iranian financial institutions, in turn, tendered payments requests to IBK to transfer CBI Won Account funds to pay Anchore's invoices.

### B. ZONG REPRESENTED FALSELY TO IBK THAT ANCHORE SOLD HUNDREDS OF MILLIONS OF DOLLARS IN ADDITIONAL CONSTRUCTION MATERIALS TO IRAN TO WITHDRAW THE EQUIVALENT OF OVER $1 BILLION FROM THE CBI WON ACCOUNT

35.    In or around May 2011, Zong tendered additional fraudulent documents to IBK and the Korean government in order to obtain hundreds of millions of dollars in additional transfers from the CBI Won Account. Specifically, Anchore represented fraudulently that it possessed a

contract dated February 2011 to supply Farsoodeh with additional construction materials, including "Heavy duty Galvazined Steel, Custom pre-colored Window & [W]ood frame[s]."

36.　　In or around May 2011, Anchore also submitted an application to the Korean government requesting permission to engage in this type of trade with Iran. According to Zong, the value of the materials to be supplied to Iran was $15,605,704,000. In reality, however, Anchore never acquired nor exported any such construction materials to Iran.

37.　　In order to supply construction materials to Farsoodeh, Zong claimed that he would purchase these materials from Orchidea Trading, a UAE entity controlled by the Uncharged Conspirators—the same individuals who also owned Farsoodeh.

38.　　Notwithstanding the fact that Anchore never sold any construction materials to Farsoodeh, and Anchore acquired no materials from Orchidea Trading, Zong requested that IBK utilize funds in the CBI Won Account to pay him the equivalent of hundreds of millions of dollars in compensation.

39.　　Based upon fraudulent commercial invoices and contracts Zong presented to IBK, the equivalent of more than $1 billion in KRW was transferred from the CBI Won Account to Anchore's account at IBK between February and July 2011.

40.　　Zong deceived IBK regarding the transactions. Zong concealed material facts, for example, that Orchidea Trading, where the vast majority of the CBI Won Account funds were sent, was controlled by the same individuals that owned Farsoodeh—namely, the Uncharged Conspirators.

13

a. For instance, in manufacturing fraudulent contracts between Anchore and Orchidea, an associate of the Uncharged Conspirators ("Iranian Associate A") advised Zong to remove any references to Farsoodeh in Anchore's contracts with Orchidea in order to avoid "problems" with Orchidea's banks in the UAE. On or about June 6, 2011, Zong received an email from Iranian Associate A stating:

> *We can only make the [contract] direct with Anchore and Orchidea. As if we involve any Irani company like Farsoodeh in our contract then our banks in UAE will creat problems for us. So isnt this possible that we do contracts same as before. One contract between Farsoodeh and Anchore , and second one between Orchidea and Anchore[?]"*

b. Similarly, Houshang Hosseinpour also reiterated to Zong the importance of not disclosing how Zong would utilize the CBI Won Account funds once they were released to him by IBK. In an email to Zong, Hosseinpour wrote: "Iran now is bad situation. If any swift will come back to iran.our road will be close." Hosseinpour copied Orchidea Trading's email address on this email. In a later email, Hosseinpour confirmed to Zong, "we got green light from Iran."

41. Upon receiving these funds, Zong caused some of these funds to be exchanged for U.S. dollars and wired—at the direction of the Uncharged Conspirators—to nearly four dozen different persons and entities in several jurisdictions, including, among other places, the United States, the UAE, Switzerland, Canada and Bahrain. The funds were directed as follows:

a. Approximately $863 million was sent to accounts maintained in the name of Orchidea Trading at Emirates Bank in the UAE;

b. Approximately $131,000,000 was transferred cumulatively to other shell company accounts in the U.A.E.;

14

c.   $10,564,572 was transferred cumulatively to twenty different individuals and four companies in the United States, including Alaska;

d.   Approximately €469,978 EUR (approximately $668,825 equivalent) was transferred cumulatively to three companies in Italy;

e.   €299,653 EUR (approximately $426,436 equivalent) was transferred cumulatively to six companies in Germany;

f.   €233,580 EUR (approximately $332,407 equivalent) was transferred cumulatively to two companies in Switzerland;

g.   €97,000 EUR (approximately $138,040 equivalent) was transferred cumulatively to a company in Austria;

h.   €56,000 EUR (approximately $79,693 equivalent) was transferred cumulatively to an individual and one company in France;

i.   €32,480 EUR (approximately $46,222 equivalent) was transferred cumulatively to a company in the Netherlands;

j.   $40,000 was transferred cumulatively to an individual and one company in Canada; and

k.   $30,000 was transferred cumulatively to two individuals in Bahrain.

42.   As compensation for participating in this fraudulent scheme to funnel the equivalent of more than $1 billion from the CBI Won Account to overseas accounts controlled by or for the benefit of the Uncharged Conspirators, Zong received an amount equivalent to approximately $10 to 17 million as compensation. Approximately $10 million of these funds were wired and deposited by Zong in a financial institution in Anchorage, Alaska.

//

//

15

**C.** **APPROXIMATELY $20 MILLION IN FUNDS TRACEABLE TO THE CBI WON ACCOUNT WERE UTILIZED TO ATTEMPT TO PURCHASE THE TBILISI HOTEL**

43. As described below, the Uncharged Conspirators used $20 million in funds traceable to the fraudulently procured CBI Won Account funds in attempting to purchase the Tbilisi Hotel in Georgia from RAKIA. The Uncharged Conspirators paid the equivalent of approximately $20 million to RAKIA, the Tbilisi Hotel's owner.

44. Between October 2011 and March 2012, Houshang Hosseinpour, among others, engaged in discussions with RAKIA to purchase the Tbilisi Hotel. On or about March 1, 2012, New York Exchange LLC, an entity owned by the Uncharged Conspirators and whose chairman was Houshang Hosseinpour, and RAK Hotel, a subsidiary of RAKIA, entered into a share purchase agreement ("SPA"). Rak Hotel agreed in the SPA to sell the Tbilisi Hotel to New York Exchange LLC for approximately $62.5 million.

45. Pursuant to the SPA, New York Exchange LLC agreed to make an initial deposit equivalent to approximately $20 million with RAKIA. Between on or about October 12, 2011, and March 28, 2011, the Uncharged Conspirators tendered to RAKIA a series of checks drawn on multiple accounts maintained in the UAE in the names of various shell companies they controlled, including Orchidea Trading, New York General Trading LLC[1] and Tansam General Trading (New York General Trading LLC's former name). Specifically, RAKIA deposited the

---

[1] On February 6, 2014, New York General Trading LLC was designated by the U.S. Department of the Treasury as being subject to sanctions and was placed on OFAC's FSE List. In announcing the designation, the Treasury Department stated that New York General Trading LLC was an entity owned and/or controlled by the Uncharged Conspirators and was one of several front companies used "to deceive the international community ... by generating false invoices in connection with transactions involving designated Iranian banks."

16

following checks it received from the Uncharged Conspirators in connection with the SPA: (i) an Orchidea Trading check dated October 12, 2011, for 2.2 million AED; (ii) an Orchidea Trading check dated October 17, 2011, for 2 million AED; (iii) a check drawn on a New York General Trading LLC account dated October 19, 2011, for 10,478,000 AED; (iv) a check drawn on a New York General Trading LLC account dated November 16, 2011, for 8,257,500 AED; (v) a check drawn on a New York General Trading LLC account dated December 14, 2011, for 11,453,125AED; (vi) a check drawn on a New York General Trading LLC account dated December 28, 2011, for 11,453,125AED; (vii) an Orchidea Trading check dated March 19, 2012, for 725,000 AED; (viii) an Orchidea Trading check dated March 28, 2012, for 13 million AED; and (ix) an Orchidea Trading check dated March 28, 2012, for 13.25 million AED.

46.     Upon receiving these checks, RAKIA deposited the funds into its account at the Commercial Bank of Dubai in the UAE. Those funds comprise the Defendant Funds in this action.

47.     After negotiations between the Uncharged Conspirators and RAKIA terminated without being able to successfully conclude a final purchase agreement for the Tbilisi Hotel, VI2 Partners GmbH ("VI2"), an Austrian legal entity owned by Marc-Milo Lube, filed civil claims (the "Defendant Claim") against RAKIA (the "Georgia Action") in the Tbilisi City Court seeking, among other things, the return of all funds provided to RAKIA by Orchidea Trading, New York General Trading LLC and Tansam General Trading in connection with the SPA as well as additional damages allegedly caused by RAKIA. In filing its action, VI2 asserted that it had acquired the cause of action from Orchidea Trading, New York General Trading LLC and Tansam General Trading pursuant to a claim purchase agreement.

48.    The Defendant Claim was filed by VI2 on or about February 19, 2016.  After the Tbilisi Court issued a ruling in VI2's favor, RAKIA appealed the decision of the Tbilisi City Court to the Tbilisi Court of Appeal.

## FIRST CLAIM FOR RELIEF

49.    Paragraphs 1 through 49 above are incorporated by reference as if fully set forth herein.

50.    The Defendant Funds and Defendant Claim (collectively, the "Defendant *Res*") is property that constitutes, and is derived from, proceeds traceable to one or more violations of IEEPA and foreign bank fraud, which are specified unlawful activities under 18 U.S.C. §§ 1956(c)(6)(B)(iii), 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv) and/or 1956(c)(7)(D).

51.    The Defendant *Res* is, therefore, subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF

52.    Paragraphs 1 through 52 above are incorporated by reference as if fully set forth herein.

53.    The Defendant *Res* is involved in, or is traceable to property involved in, one or more transactions or attempted transactions in violation of section 18 U.S.C. § 1957 and a conspiracy to commit such offenses in violation of section 18 U.S.C. § 1956(h).  Specifically, the Defendant *Res* was involved in or is traceable to property involved in one or more financial transactions, attempted transactions, and a conspiracy to conduct or attempt to conduct such

18

transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activities, namely: IEEPA and foreign bank fraud.

54.     The Defendant *Res* is, therefore, subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## **THIRD CLAIM FOR RELIEF**

55.     Paragraphs 1 through 55 above are incorporated by reference as if fully set forth herein.

56.     The Defendant *Res* is involved in, or is traceable to property involved in, one or more transactions, or attempted transactions in violation of section 18 U.S.C. § 1956(a)(1)(B)(i) and a conspiracy to commit such offenses in violation of section 18 U.S.C. § 1956(h). Specifically, the Defendant Asset is involved in and is traceable to property involved in one or more financial transactions, attempted transactions, and a conspiracy to conduct or attempt to conduct such transactions involving the proceeds of specified unlawful activity, that is: (i) violations of IEEPA (50 U.S.C. §§ 1701-1705); and (ii) a foreign offense involving fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); and were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

57.     The Defendant *Res* is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

//

//

## FOURTH CLAIM FOR RELIEF

58. Paragraphs 1 through 57 above are incorporated by reference as if fully set forth herein.

59. The Defendant *Res* was involved in, or is traceable to property involved in, one or more transactions or attempted transactions in violation of section 18 U.S.C. § 1956(a)(2)(B) and a conspiracy to commit such offenses in violation of section 18 U.S.C. § 1956(h). Specifically, the Defendant Asset was involved in and are traceable to funds that were and were attempted to be, transported, transmitted, or transferred, and a conspiracy to transport, transmit, or transfer, to a place in the United States from or through a place outside the United States, with the knowledge that the funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity and knowledge that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activities, that is: (i) violations of IEEPA (50 U.S.C. §§ 1701-1705); and (ii) a foreign offense involving fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)).

60. The Defendant *Res* is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, plaintiff United States of America prays that:

(a) due process issue to enforce the forfeiture of the Defendant *Res*;

(b) due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

20

(c)     this Court decree forfeiture of the Defendant *Res* to the United States of America for disposition according to law; and

(d)     for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: June 3, 2020                          Respectfully submitted,

                                             BRYAN SCHRODER
                                             United States Attorney
                                             DEBORAH L. CONNOR
                                             Chief
                                             Money Laundering & Asset Recovery Section
                                             U.S. Department of Justice

                          By:    _____

                                 JONAS WALKER
                                 STEVEN SKROCKI
                                 Assistant U.S. Attorney
                                 District of Alaska
                                 WOO S. LEE
                                 Deputy Chief, MLARS
                                 MICHAEL OLMSTED
                                 Sr. Trial Attorney, MLARS
                                 U.S. Department of Justice

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA


Subscribed before me on June 3, 2020, in Anchorage, Alaska.

                                 _____
                                 Jennifer Lotz, Notary
                                 My commission expires: with office

21

## **VERIFICATION**

I, Benjamin R. Mattson, hereby verify and declare under penalty of perjury that I am a Special Agent with the Federal Bureau of Investigation, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are official files and records of the United States, publicly available files and historical information, information supplied to me by other law enforcement officers, experts, and other witnesses, as well as my investigation in this case, together with others, as a Special Agent of the Federal Bureau of Investigation.

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed June 3, 2020, at Anchorage, Alaska.

Benjamin R. Mattson
Special Agent
Federal Bureau of Investigation

Subscribed before me on June 3, 2020, in Anchorage, Alaska.

Jennifer Lotz, Notary
My commission expires: with office

JENNIFER LOTZ
Commission # 10605
NOTARY PUBLIC
My Commission Expires With Office
STATE OF ALASKA